**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF FLORIDA**
**TAMPA BAY DIVISION**

| | |
|---|---|
| ALVIN REINAUER, on behalf of himself and all others similarly situated | |
| | Case No. _____ |
| *Plaintiff,* | **JURY TRIAL DEMANDED** |
| v. | |
| UNITED AIRLINES, INC., | |
| *Defendant.* | |

**CLASS ACTION COMPLAINT**

1. Plaintiff complains as follows against Defendant United Airlines, Inc. ("United").

2. Beginning in the summer of 2021, United Airlines' began a strategic, company-wide campaign to coerce its employees to violate their religious beliefs and ignore their health. To accomplish this goal, United refused to provide any reasonable accommodations to its mandate that its employees receive one of the COVID-19 vaccines (the "Mandate"). United's CEO stated publicly that all unvaccinated employees would be terminated by the end of September. When United finally realized that it would be forced to follow Title VII and the ADA, it instead told *every* employee who requested an accommodation that he or she would be placed on indefinite, unpaid leave: effectively terminated. As the Fifth Circuit confirmed in subsequent litigation, that decision caused immediate and significant harm by creating a "crisis of conscience." *Sambrano v. United*

*Airlines, Inc.*, No. 21-11159, 2022 WL 486610, at *9 (5th Cir. Feb. 17, 2022). Worse, United imposed this pressure campaign merely so that it could advertise a 100% vaccination rate after deciding that marketing was more important than its employees' civil rights.

3. From the outset, United's CEO Scott Kirby made clear that he would not allow United to provide reasonable accommodations to its vaccine mandate, despite United's legal obligations to do so. Mr. Kirby did not believe any such accommodations were necessary because, in his mind, United employees were making up their beliefs and "all [of a] sudden decid[ing] I'm really religious." That disdain for United employees of faith flowed directly from Kirby to those in Human Resources charged with reviewing accommodation requests who followed their CEO's lead and openly criticized the faith and medical conditions of employees seeking accommodations.

4. This was all part of United's campaign to coerce compliance and ignore United's legal obligations to provide reasonable accommodations. That is no doubt why United designed a purposefully vague and coercive accommodation process, imposed unreasonable and arbitrary deadlines, subjected employees to hostile and invasive questions criticizing their beliefs and health, and failed to engage in any discussion with employees about their job duties or the types of accommodations that would allow the employees to continue working. The specifics did not matter, since United had already decided to offer only the accommodation of indefinite, unpaid leave. This universal accommodation plan sent a clear punitive message to coerce employees: acquiesce or be functionally terminated.

5. After Plaintiffs in the *Sambrano* case filed a lawsuit, United started making changes for some employees—the company provided punitive "accommodations" to some

but eventually placed pilots and flight attendants on unpaid leave if they were unable to take the vaccine.

6.      United's coercion was further stymied in February 2022 by the Fifth Circuit's ruling that the company was imposing an irreparable harm on its employees by making them choose their belief/health over their duty to provide for their families. Virtually immediately, United provided a path back to work for the pilots and flight attendants on unpaid leave.

7.      United's coercion and discrimination continued in other areas, though— and persisted against those interviewed and conditionally hired by the company long after it was accommodating its other employees.

8.      Plaintiff is a pilot who sought to be hired by United during March 2022. During that time, any new hires—whether pilots, flight attendants, or otherwise—were required to comply with the vaccine mandate even if they had a need under Title VII or the ADA for United to accommodate their unvaccinated status.

9.      United gave Mr. Reinauer a "Conditional Job Offer" (CJO) that stated he could begin work with United as soon as he received a COVID-19 vaccine.

10.     Mr. Reinauer sought an exemption from United based on his sincerely held religious belief against taking the vaccine and United acknowledged that belief.  The company refused, however, to allow Mr. Reinauer to come "on property" in order to train and begin flying for United for more than five months because he would not violate his beliefs and take the vaccine.  United did this with numerous other newly-hired employees, too.

11.     There was no legitimate business justification for United's actions. Contrary to the company's pretextual goal of "safety," the "real reason for the vaccine

3

mandate and indefinite unpaid leave policy [wa]s 'virtue signaling' and 'currying political favor.'" *Sambrano v. United Airlines*, 45 F.4th 877, 879 (5th Cir. 2022) (Ho, J., concurring in denial of rehearing en banc). Indeed, it subsequently became clear that United implemented the Mandate as part of a marketing campaign, rather than in pursuit of safety. United knew it could use its employment leverage to coerce and intimidate employees (and new hires) to abandon their sincerely held religious beliefs and health concerns by receiving the COVID-19 vaccine.

12. Yet by that time, vaccine mandates were already being phased out and even United itself was already accommodating its pilots and other employees unable to receive the vaccine. There was no legitimate basis for refusing those same accommodations to newly-hired employees.

13. United's actions left Mr. Reinauer, like many other United employees, with the same crisis of conscience creating the impossible choice of either receiving the COVID-19 vaccine—at the expense of his religious beliefs—or losing his livelihood. In doing so, United violated federal law by failing to engage in an individualized interactive process to provide reasonable accommodations, and also by retaliating against employees who engaged in protected activity.

14. As a result of United's actions, Mr. Reinauer, and others, lost months of pay and higher placement on the company's seniority list. At the same time, United doubtless succeeded with other employees similarly situated to Mr. Reinauer and coerced them into taking the vaccine to begin working even though they were entitled to an exemption.

15. These are the kinds of "companywide policies" and "consistent practices" that the Supreme Court held in *Dukes* invite class action treatment. *Wal-Mart Stores v. Dukes*, 564 U.S. 338 (2011). When a company discriminates againsts large swaths of its

employees at once, it should not be surprised to find itself defending against all the mistreated employees at once. This case fits comfortably within Rule 23.

## PARTIES

### A. Plaintiff

16. Plaintiff Alvin Reinauer—a resident of Pinellas County, FL—is a pilot for United Airlines, and flies out of Newark, NJ.

### B. Defendant

17. Defendant United Airlines is a Delaware corporation with its principal place of business in Chicago, Illinois.

## JURISDICTION AND VENUE

18. This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331, 1343, and 42 U.S.C. § 2000e-5(f)(3).

19. Plaintiff's claims for declaratory relief are authorized by 28 U.S.C. §§ 2201 and 2202.

20. Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events complained of herein occurred in this District and Division.

21. United's actions were felt by Plaintiff in this District, and this is where the unlawful employment practices occurred. Each day Mr. Reinauer was faced with the question of whether he should withdraw his request for a reasonable accommodation while living in this District.

**FACTUAL ALLEGATIONS**

**A.    The COVID-19 Pandemic and Response**

22.    By Spring 2020, the novel coronavirus SARS-CoV-2, which can cause the disease COVID-19, spread rapidly around the world.

23.    Around this same time, United began implementing certain mitigation procedures for its workforce, including several of the following requirements for its employees: wear United-issued masks, gloves, and, for some, eye protection; maintain distance from others; and participate in temperature checks prior to starting any shift or work assignment.  United also began increasing the cleaning regimens of its aircraft—spraying cabins with an anti-viral spray between flights—and it upgraded its aircraft HEPA filters to prevent the spread of COVID-19.

24.    Since then, at least four separate COVID-19 vaccines have been developed and authorized or licensed for use in the United States.  The Food and Drug Administration ("FDA") issued an Emergency Use Authorization ("EUA") for the Pfizer-BioNTech vaccine on December 1, 2020.  One week later, the FDA issued a second EUA for the Moderna COVID-19 vaccine.  The FDA also issued an EUA for the Johnson & Johnson COVID-19 vaccine on February 27, 2021.  And, more recently, the FDA issued an EUA for the Novavax COVID-19 vaccine on July 13, 2022.  The Pfizer-BioNTech vaccine received FDA approval for use in a slightly altered form on August 23, 2021, and is said to be produced as Comirnaty—a form legally distinct from the EUA version.  The Moderna vaccine, Spikevax, has also since received FDA approval.

25.    Subsequent to the development of the vaccines, the Delta and Omicron variants of COVID-19 spread around the world.  Considering those variants, the accompanying increases in transmissibility of the virus, and the significant waning of the

vaccines' efficacy, the FDA began recommending booster shots in addition to the initial vaccine regimens proposed.

26. The CDC also subsequently recognized that a prior COVID-19 infection provides protection superior to a vaccine alone. Tomás M. León et al., *Morbidity & Mortality Wkly. Rep., COVID-19 Cases and Hospitalizations by COVID-19 Vaccination Status and Previous COVID-19 Diagnosis—California and New York, May–November 2021*, CDC (Jan. 28, 2022) ("CDC Report"), https://www.cdc.gov/mmwr/volumes/71/wr/mm7104e1.htm?s_cid=mm7104e1_w (noting that "[b]y early October [of 2021], persons who survived a previous infection had lower case rates than persons who were vaccinated alone").

27. Not only has the CDC confirmed this, but additional studies have shown that the effectiveness of the COVID-19 vaccines wane significantly over time. *See* Sarah A. Buchan et al., *Estimated Effectiveness of COVID-19 Vaccines Against Omicron or Delta Symptomatic Infection and Severe Outcomes* tbl. 2, JAMA Netw. Open (Sept. 22, 2022), https://jamanetwork.com/journals/jamanetworkopen/fullarticle/2796615 (Table 2); Christian Holm Hansen et al., *Vaccine Effectiveness Against SARS-CoV-2 Infection with the Omicron or Delta Variants Following a Two-dose or Booster BNT162b2 or mRNA-1273 Vaccination Series: A Danish cohort study* tbl., medRxiv [preprint] (Dec. 23, 2021), https://www.medrxiv.org/content/10.1101/2021.12.20.21267966v3.

28. According to the CDC's recommendation during the relevant time frame, to be "Up to Date" or current with COVID-19 vaccinations, an individual must have received "the most recent booster dose recommended for you by CDC." CDC, *Stay Up to Date with Vaccines: When Are You Up to Date?* (Jan. 25, 2023),

https://www.cdc.gov/covid/vaccines/stay-up-to-date.html?CDC_AAref_Val=https://www.cdc.gov/coronavirus/2019-ncov/vaccines/stay-up-to-date.html[1].  For adults, this consisted of a two-shot regimen of the Pfizer, Moderna, or Novavax vaccine or a one-shot dosage of the Johnson & Johnson vaccine, followed by a booster after the primary series of either the Pfizer or Moderna vaccine.  Previously, CDC recommended adults over 50 years old receive a second booster at least four months after the first booster.  *Id.*

### B. United's Vaccine Mandate

29. On August 6, 2021, United's CEO Scott Kirby announced that all employees would be required to receive a COVID-19 vaccine within five weeks of the FDA's granting full approval of a vaccine, or five weeks after September 20, 2021, whichever came first.

30. As noted, the FDA approved Pfizer's COVID-19 Comirnaty vaccine on August 23, 2021.

31. Accordingly, United employees were told they must receive at least the first dose of a COVID-19 vaccine by September 27, 2021.

32. Employees were required to upload a copy of their proof of vaccination to a United database called Flying Together by September 27, 2021.  *See* Thomas Pallini, *United Is the First US Airline to Require All Employees be Vaccinated Against COVID-19*, Bus. Insider (Aug. 6, 2021), https://www.businessinsider.com/united-requiring-us-employees-get-covid-19-vaccine-2021-8.

---

[1] To be up to date, the CDC's webpage currently recommends getting the "the 2024–2025 COVID-19 vaccine" for "[e]veryone ages 6 months and older," regardless of prior vaccination status. *Id.*

33. Employees who did not upload a copy of their vaccination record showing a COVID-19 vaccination or who were not granted an "accommodation" by United were terminated.

34. United's Mandate was absolute and uniform—there was no alternative for periodic testing, mask wearing, or social distancing, even for employees who already had COVID-19 and still enjoyed immunity from the disease, despite the Equal Employment Opportunity Commission's ("**EEOC**") guidance suggesting that these alternatives are appropriate accommodations. *See What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws: Vaccinations-Overview, ADA, Title VII, and GINA,* EEOC (May 15, 2023), https://www.eeoc.gov/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#K. Rather, every domestic United employee was forced to choose vaccination or termination. Alternatively, employees who were "accommodated" for religious or medical reasons could choose what they were led to believe would be several years of unpaid leave without benefits: effectively, termination.[2]

35. United's policy contrasted with the Federal Government's announcement that the Department of Labor was developing a rule to require certain large employers to mandate vaccination *or* periodic testing for its employees in compliance with the EEOC's recommendations. United did not offer the option of periodic testing, either in general or for employees who received an accommodation.

---

[2] As it turned out, the unpaid leave lasted approximately four months—ending shortly after the Fifth Circuit's determination that United had irreparably harmed its employees in the *Sambrano* case. *Sambrano v. United Airlines, Inc.*, 2022 WL 486610, at *6 (5th Cir. Feb. 17, 2022), *reh'g denied,* 45 F.4th 877 (2022).

36. The policy from United also differed substantially from the European Union's digital COVID-19 certificate, which—at least at the time—considered the following as equivalent: (1) a COVID-19 vaccine; (2) a negative COVID-19 test; or (3) a previous recovery from COVID-19. *See EU Digital COVID Certificate*, European Comm'n, https://www.consilium.europa.eu/en/policies/coronavirus-pandemic/eu-digital-covid-certificate/#how (last visited Sept. 23, 2024).

37. Through this policy, United ignored the CDC's recognition that naturally occurring immunity from COVID-19 was at least as strong as vaccine-induced immunity. *See* CDC Report *supra*.

38. When United announced its Mandate, it stated that employees could request accommodations for either religious or health reasons. *See* Daniella Genovese, *United Airlines Vaccine Mandate Driven by Delta Variant, Hospitalization Data, CEO Scott Kirby Says,* FoxBusiness (Aug. 10, 2021), https://www.foxbusiness.com/lifestyle/united-ceo-scott-kirby-pushed-vaccine-mandate-driven-by-hospitalization-data. That was in line with EEOC guidance on private employers issuing such mandates. *See What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws* §§ K.1 & K.2., EEOC (May 28, 2021), https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws.

39. Under United's mandate, employees were required to receive either the Pfizer, Moderna, or Johnson & Johnson vaccine. As United did not mandate booster shots, many United employees had not received a COVID-19 vaccine in a year or longer at the same time United was putting unvaccinated employees out of work. Those vaccinated but unboosted employees were thus not in full compliance with CDC

standards. Tellingly, the CDC never put anyone out of work over refusal to get a COVID-19 vaccine. Johnson & Johnson likewise allowed the accommodation of masking for pharmaceutical sales representatives with religious/medical objections to taking a vaccine.

40. Even more curious, United continued to require the outdated initial COVID-19 vaccines for all employees and new hires, preventing newly hired pilots and other employees, who were exempt from the mandate under Title VII or the ADA (such as some Plaintiffs here), from starting work unless they acquiesced to the manate even after other exempt employees were brought back to work.

**C.     United's Campaign to Pressure Employees**

41. In the days leading up to United's August 31, 2021 deadline for submitting accommodation requests, United's CEO Mr. Kirby threatened employees "to be very careful about" requesting such accommodations. He stated that there would be very "few people that get through the medical and religious exemption process"—describing such employees derisively as "all [of a] sudden decid[ing] 'I'm really religious.'" *Sambrano*, 2022 WL 486610, at \*9. Mr. Kirby warned those employees to be very careful because they were "putting [their] job[s] on the line" if they requested such accommodations. *See id.*

42. In addition to Mr. Kirby's threats, United placed substantial and unconscionable pressure on its employees. For instance, as just one example, in early-September 2021, United mailed postcards to all employees who had not yet provided proof of vaccination.

43. Those postcards stated that the employee had not uploaded proof of vaccination and repeated in bold text: "Unvaccinated employees without a reasonable

accommodation will be separated from United." As these postcards were not sent in an envelope, United effectively broadcast its employees' medical information to all who saw the postcards, allowing a wide range of individuals outside United to also exert pressure on the employee.

44.     According to United, the Mandate was aimed at increased safety. *See* Leslie Josephs, *United Will Require its U.S. Employees to Be Vaccinated, A First for Country's Major Airlines*, CNBC (Aug. 6, 2021), https://www.cnbc.com/2021/08/06/united-airlines-vaccine-mandate-employees.html. Yet United did not require any passenger flying on its planes, or interacting with its staff, to be vaccinated. *See* David Koenig, *United Airlines Will Require US employees to Be Vaccinated*, AP News (Aug. 6, 2021), https://apnews.com/article/united-airlines-vaccine-mandate-employees-frontier-e8eef8e8f11d4924b81768484e5401a1. Nor did it require its employees from other countries to receive the COVID-19 vaccine, even though those employees work alongside United crews from the United States. *Id.*

45.     The Mandate also did not apply to regional airline partners that fly United customers on shorter routes that feed United's mainlines. Employees from these partners work alongside United employees in the terminals and on the ramp, share employee cafeterias, and their pilots and flight attendants deadhead on United mainline flights. Likewise, United pilots and flight attendants are often scheduled to deadhead on these regional aircraft. *See* Josephs, *supra*.

46.     And the Mandate did not apply to pilots or flight attendants from other airlines allowed to ride in the "jumpseats" of United aircraft. In the case of pilots, the jumpseat is located in the cockpit somewhat between the United flight officers' seats in extreme proximity to both United pilots. In the case of flight attendants, their jumpseats

12

are generally in the cabin with passengers, and next to seats for the flight attendants who are working the flight. Further, United concurrently relaxed its requirement for flight attendants to wear gloves and eye protection that was introduced early in the COVID-19 pandemic, and United discontinued the "deep" cleaning disinfectant spraying inside the aircraft after each flight, as was the policy at the outset of the pandemic.

47. Likewise, many employees deemed "non-customer facing" who work in hangars or in operational rolls rountely intereacted with United's vendors and contractors who—though they worked in close proximity to United employees—were not subject to United's arbitrary mandate.

48. Despite United's suggestion that vaccination was necessary to keep its workforce safe, United was simultaneously telling consumers that the inside of a United airplane was one of the safest places to be during the pandemic—not because of vaccines, but because of cabin airflow and pressurization.

49. United's actions thus confirmed that the Mandate was not aimed at safety, but rather at pressuring employees like Plaintiffs to forsake their religious beliefs and health by receiving the COVID-19 vaccine to support a marketing campaign.

**D. Federal Law Prohibits Religious and Disability Discrimination and Retaliation**

50. Title VII prohibits United from discriminating against employees based on their religion. This "include[s] all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j).

51. In other words, "[a]n employer has the statutory obligation to make reasonable accommodations for the religious observances of its employees, but is not required to incur undue hardship." *Weber v. Roadway Express, Inc.*, 199 F.3d 270, 273 (5th Cir. 2000).

52. Title VII also prohibits United from retaliating against an employee for engaging in protected activity. *See Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 319 (5th Cir. 2004).

53. Similarly, under the ADA, United may not "discriminate against a qualified individual on the basis of disability." *Caldwell v. KHOU-TV*, 850 F.3d 237, 241 (5th Cir. 2017).

54. Such discrimination includes "fail[ing] to make 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability . . . unless . . . the accommodation would impose an undue hardship.'" *Feist v. Louisiana*, 730 F.3d 450, 452 (5th Cir. 2013).

55. Additionally, the ADA makes it unlawful to retaliate against an employee for seeking an accommodation. *See* 42 U.S.C. § 12203(a).

**E. United's Response to Accommodation Requests**

56. After United first announced its vaccine mandate in August of 2021, the company promised unpaid leave to anyone entitled to a reasonable accommodation.

57. United never explained why pilots and flight attendants could not be accommodated even though they fly in an environment that United's CEO Mr. Kirby boasted to a congressional committee "is the safest place that you can be indoors," including places like an intensive care unit or operating room. S. Comm. on Com., Sci., & Transp., *Airline Oversight Hr'g,* C-SPAN, at 56:24 (Dec. 15, 2021) ("Oversight Hr'g"),

https://www.c-span.org/video/?516667-1/airline-oversight-hearing. Further, Mr. Kirby explained that, because of the airflow within planes, sitting next to a passenger in a United plane is equivalent to sitting 15 feet from the person in a typical building. *Id.* at 56:42. United itself boasted of the advanced air filtration system in its planes that make it "virtually impossible for one person to transmit COVID to another" on a United flight.

58. As United stated in its marketing materials, it partnered with the Cleveland Clinic to study the safety of its aircraft during the COVID-19 pandemic. And United points its customers to the results of that study, as well as a Department of Defense study, "showing that aircraft cabins are among the safest of public indoor environments." In fact, United tells its customers that, "even when the plane is full, on average only 0.003% of infected air particles could enter the breathing zone of seated, masked passengers[.]"

59. United also did not explain why its distinctions did not include any consideration for employees who have previously recovered from COVID-19 and therefore possess antibodies that may provide them with protection against future COVID-19 infection at rates similar to (or greater than) vaccination. United further failed to explain why it would allow pilots from other airlines to ride in the cockpit with United flight officers even though those other pilots would not be required to have a COVID-19 vaccination. Nor did United explain why its non-U.S. employees were not required to be vaccinated, even though crew members from outside the U.S. often work together on flights with U.S. crew members. The same is true for the regional aircrews that fly shorter routes for United. What United did do was rely on arbitrary line-drawing rather than engaging in the interactive process with each employee who requested an accommodation.

60.     Instead, United promised unpaid leave to any "accommodated" employee with no specified end date.  Further intending to coerce employees to abandon their faith and risk their health by receiving the COVID-19 vaccine, United stated that the period of unpaid leave could last up to 72 months (*i.e.*, up to 6 years).[3]  United also told those who were facing unpaid leave that upon return, if their current position had been filled, they may not have a job at United to which they could return.

**F.     United's Approach After the *Sambrano* Lawsuit**

61.     As mentioned above, after the initial filing of the *Sambrano* lawsuit, United began accommodating some employees unable to take the COVID-19 vaccine (albeit with a punitive masking/testing regime).

62.     Kirby made clear that the masking-and-testing accommodation was intended to be excessive, as he wanted the policy to "sound[] very serious to [employees]. Masks at all times (including outdoors) and *automatic termination* for violating the policy."  HR had to remind Kirby that his proposed termination policy would violate the employees' collective bargaining agreements.  Kirby acquiesced (slightly) and allowed just one warning before termination.  Similarly, Kate Gebo—United's Executive Vice President of Human Resources—later pursued "remov[ing] discipline from everyone who has been vaccinated but has a mask warning in the record."  Of course, United did not make such offers to "accommodated" employees with mask violations.  As a result, employees were terminated for minor infractions of United's draconian masking and testing policy.

---

[3] After the initial filing of the *Sambrano* lawsuit, during an agreed-upon stay of injunctive relief taking place prior to a scheduled preliminary injunction hearing, United determined that the non-customer facing employees could be returned to work under an oppressive masking and testing protocol, while the customer-facing service representatives were given some opportunities for work, but their normal schedules and ability to work overtime were severely altered.

63. The unpaid leave coercion tactic, however, remained in place for pilots and flight attendants exempt under federal law from the mandate. While the district court found that the pilots and flight attendants could be accommodated, it declined to issue a temporary restraining order since it believed the harm was only economic and thus not irreparable. Those who did not acquiesce to United's coercion remained on unpaid leave for approximately 5 months until the Fifth Circuit Court of Appeals held that the unpaid leave tactic was creating an irreparable harm—forcing employees to daily consider whether to violate their conscience or not. A class has now been certified as to those pilots and flight attendants placed on unpaid leave during the pendency of the Fifth Circuit's decision.

64. Once the Fifth Circuit issued its decision in February of 2022, United began immediately making plans to begin accommodating pliots and flight attendants unable to take the vaccine. Those employees all returned to work on March 28, 2022—the same day that Mr. Reinauer interviewed for his job with United.

65. Mr. Reinauer received a job offer on March 30, 2022—conditioned on him taking a COVID-19 vaccine.

**G. Plaintiff's Accommodation Request and United's Response**

66. Mr. Reinauer sent a Reasonable Accommodation Request ("RAP") to United, seeking an accommodation for the COVID-19 vaccine requirement.

67. The RAP was based on Mr. Reinauer's sincerely held religious belief that the elective termination of a pregnancy is wrong and that the COVID-19 vaccines were manufactured using fetal stem cell lines derived from an abortion. Mr. Reinauer's life-long adherence to the Catholic belief that life is sacred from the moment of conception meant that he was unable to participate in or be complicit with a product derived from an

17

abortion, no matter how attenuated. It would be a direct violation of his religious beliefs and conscience to take the vaccine. He also believes mRNA technology and cellular manipulation are morally objectionable to his faith and understanding of God.

68. United responded that Mr. Reinauer's RAP was "approved" but that they could not let him begin working until "a few other countries" lifted "their COVID entry requirements." He was put on hold with his training/employment while other pilots who did not have a religious belief preventing vaccination were allowed to proceed to training at United's Denver facility and then begin flying for the company.

69. At that time, however, no country had a complete ban on aircrew that were unvaccinated—every country had alternatives (such as quarantine or negative pre-travel test results) that would allow a pilot to fly there. Moreover, the countries that did have limited entry requirements were not countries to which Mr. Reinauer would have flown as a new hire. Indeed, he has still not flown to any of those countries in the more than 18 months that he has been flying for United once he was allowed to begin working.

70. Every country at the time of United's refusal to allow Mr. Reinauer to work offered travelers the option of (1) negative COVID-19 test results before flying; (2) mask wearing; or (3) quarantine in lieu of vaccination. Flight crews would have been allowed at least the same accommodations in those countries.

71. Additionally, Mr. Reinauer—as a new hire—still required several months of training at United's training facility in Denver, Colorado. There was no vaccination requirement in the United States for a pilot at that time (as demonstrated by the pilots/flight attendants from the *Sambrano* case return to work on the same day Mr. Reinauer interviewed with United). Yet United would not send him to training while he was unvaccinated.

18

72. United engaged in no interactive process with Mr. Reinauer to determine what reasonable accommodation could be granted. Instead, he daily faced the choice of taking the vaccine or continuing to be out of work—precisley the impossible choice the Fifth Circuit has held to constituted irreparable harm.

73. After waiting five months, and with no ability to continue not working, Mr. Reinauer acquiesced to United's unreasonable demands. Mr. Reinauer finally provided United with his vaccination documentation on August 25, 2022, and United immediately provided him with a training date, thus ending the period of discrimination against him.

74. Mr. Reinauer timely filed a Form 5 complaint with the EEOC on April 27, 2023—245 days after his period of discrimination ended. He received his Right to Sue letter on July 11, 2024.

**CLASS ALLEGATIONS**

75. Plaintiff brings this class action under Federal Rules of Civil Procedure 23(a) and (b).

76. Through this action, Plaintiff seeks to represent a class of all conditionally-hired United employees who requested or attempted to request a reasonable accommodation from United's Mandate and, because of United's response, were put to the decision of either taking a vaccine to which they object or continuing to be held out of work and prevented from starting employment with the company.

77. By determining—ahead of time, without justification or process—that there would be no reasonable accommodations for any conditionally-hired employee requesting an exemption from the vaccine mandate, United effectively treated all of these accommodation requesters the same, irrespective of the job-title, location, age, medical condition, or other circumstances or characteristics. As Mr. Reinauer explained in his

EEOC charge: "To the present date of this complaint, United Airlines Pilot Hiring maintains a list of otherwise fully qualified candidates, who remain banned from entering training, with identical employment offers and religious accommodation letters that also remain on indefinite hold due to approved requests for religious accommodation."

78.     United's actions were thus generally applicable to the entire class of conditionally-hired United employees who sought reasonable accommodations from the Mandate but were not provided an accommodation so that they could begin working for United.  This is so despite United's determination during the course of the *Sambrano* lawsuit that it would in fact be able to accommodate unvaccinated employee groups, including pilots and flight attendants.

79.     Accordingly, the Court may grant relief to the entire affected class to remedy United's violation of federal civil rights laws.

80.     While the exact class size is unknown to Plaintiff at this time, it is expected to approach at least 50 or more employees.  The precise number and identification of the class members will be ascertainable from United's records during discovery.

81.     There are questions of law and fact common to all members of the class. Those common questions include, but are not limited to, the following:

> a.     Did United comply with its obligations under federal law to engage in an individualized interactive process when pretextually claiming undue burden for each individual accommodation request made by "new hire" employees conditionally offered employment with the company contingent on their vaccination status?
>
> b.     Did United comply with its obligations under federal law to reasonably accommodate conditionally-hired employees with

religious or medical objections to the vaccine mandate when the only "accommodation" offered was to continue being prevented from working?

c. Did United comply with federal law when it functionally denied accommodation requests even though reasonable accommodations for conditionally-hired employees were possible?

d. Did United retaliate against conditionally-hired employees who engaged in protected activity when it responded to each request by cutting off the employment for those individuals and engaging in coercive conduct to dissuade the employees from requesting (or continuing to seek) an accommodation?

82. Plaintiff's claims are typical of the claims of the class because he, like the putative class members, requested an accommodation from United's vaccine mandate; and United—after recognizing his need for an accommodation—declined to provide an accommodation without engaging in the interactive process.

83. For the same reason, Plaintiff will fairly and adequately protect the interests of the class.

84. The questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating Plaintiff's class claims because United treated everyone similarly situated here alike. Joinder of all members is also impracticable.

85. As explained above, United has taken at least one relevant act that affects all members of the class as represented by the named Plaintiff harmed in this District.

## COUNT I

### Violation of Title VII, 42 U.S.C. § 2000e, *et seq.*
### Religious Discrimination—Disparate Treatment Including Failure to Accommodate

86.     Plaintiff restates the foregoing paragraphs as if set forth fully herein.

87.     Title VII prohibits an employer from discriminating against an employee "because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a)(1).  This "includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business." *Id.* § 2000e(j).

88.     "Title VII of the Civil Rights Act of 1964 prohibits a prospective employer from refusing to hire an applicant in order to avoid accommodating a religious practice that it could accommodate without undue hardship." *E.E.O.C. v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768, 770 (2015).

89.     Plaintiff held a sincere religious belief that precluded him from receiving a COVID-19 vaccine.

90.     Plaintiff informed United of those beliefs and requested (and was "approved" for) a religious accommodation from the vaccine mandate.

91.     United refused to engage in the interactive process with Plaintiff regarding his religious accommodation request and instead only responded with a processes designed to deter Plaintiff from exercising his religious beliefs.  This made the interactive process irrelevant as well.

22

92. Irrespective of the interactive process, United failed to provide Plaintiff with a reasonable accommodation for his religious beliefs, taking the adverse employment action of preventing him from starting work.

93. United thereby discriminated against the Plaintiff because of his religious beliefs.

94. United's failure to provide religious accommodations has harmed and will continue to harm the Plaintiff and those similarly situated. It not only cost Plaintiff wages on the front end of his employment, it also cost him valuable positions on the seniority and longevity lists that will lead to future harms in not getting certain assignments, routes, or schedules.

95. By failing to engage in the interactive process or offer any reasonable accommodation, United's discriminatory actions were intentional and/or reckless and in violation of Title VII.

## COUNT II

### Violation of Title VII, 42 U.S.C. § 2000e, *et seq.* Religious Discrimination—Retaliation

96. Plaintiff restates the foregoing paragraphs as if set forth fully herein.

97. Title VII also makes it unlawful for "an employer to discriminate against any of [its] employees . . . because [s]he has opposed any practice made unlawful by this subchapter." 42 U.S.C. § 2000e-3(a); *see Pardi v. Kaiser Foundation Hospitals*, 389 F.3d 840, 850 (9th Cir. 2004).

98. Plaintiff engaged in protected activity when he requested a religious accommodation from United's vaccine mandate.

99. United's response to Plaintiff's protected activity—withholding a training spot and delayed commencement of his employment—was an adverse employment action intended to force employees to forgo their religious beliefs and receive the COVID-19 vaccine. This is especially true given United's knowledge that flightcrew employees such as Mr. Reinauer could be accommodated.

100. Plaintiff's religious beliefs and protected activity were the causes of United's adverse employment action. Indeed, United's derisive view of employees with religious beliefs has been documented. United did not bother engaging in an interactive process with accommodation seekers because United believed it was justified in withholding employment from unvaccinated individuals and with retaliating against those unwilling to submit to the Mandate.

101. By retaliating against Plaintiff for engaging in protected activity, United violated Title VII. This violation has harmed and continues to harm Mr. Reinauer.

## PRAYER FOR RELIEF

Plaintiff requests that the Court:

a. Declare that United has violated federal law by failing to engage in the interactive process and provide reasonable accommodations in response to requests for accommodations to its COVID-19 vaccine mandate.

b. Declare that United has violated federal law by retaliating against employees who engaged in protected activity.

c. Issue a permanent injunction, enjoining United from taking any adverse employment action against any job seeker for requesting an accommodation from a COVID-19 vaccine mandate.

24

d.      Award Plaintiff—and those similarly situated—damages, including: back pay, reinstatement or front pay, lost seniority credit, accrued benefits, retirement contributions, pre-judgment and post-judgment interest, punitive damages, and compensatory damages.

e.      Award Plaintiff reasonable attorneys' fees and costs.

f.      Order United to provide training for supervisors and managers at all corporate levels specific to Title VII religious discrimination.

g.      Grant any other relief that the Court deems just, proper, and equitable.

**DEMAND FOR JURY TRIAL**

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff demands a jury trial on all issues upon which there is a federal right to a jury trial.

October 9, 2024

Respectfully submitted.

*/s/ Catherine Cline*
Catherine Cline
Florida Bar No. 125955
**SIRI | GLIMSTAD LLP**
20200 West Dixie Highway, Suite 902
Aventura, FL 33180
Telephone: (888) 747-4529
Facsimile: (646) 417-5967
ccline@sirillp.com

*/s/ John C. Sullivan*
John C. Sullivan*
**S|L LAW PLLC**
610 Uptown Boulevard, Suite 2000
Cedar Hill, TX 75104
Telephone: (469) 523-1351
Facsimile: (469) 613-0891
john.sullivan@the-sl-lawfirm.com

*\* pro hac vice application forthcoming*

**COUNSEL FOR PLAINTIFF
AND THE PROPOSED CLASS**

26